## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PANAMA CITY DIVISION

**TIMOTHY W. JOYNER,**

    **Plaintiff,**

**v.**                                             **Case No. 5:13cv81/RH/CJK**

**CAROLYN W. COLVIN,**
**Acting Commissioner of Social Security,**

    **Defendant.**

_____/


## REPORT AND RECOMMENDATION

      This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and NORTHERN DISTRICT OF FLORIDA LOCAL RULES 72.1(A), 72.2(D), and 72.3, relating to review of administrative determinations under the Social Security Act ("Act") and related statutes, 42 U.S.C. §§ 401-1400v. The case is now before the court pursuant to 42 U.S.C. § 405(g) for review of a final determination of the Commissioner of Social Security ("Commissioner") denying claimant's applications for disability insurance benefits under Title II of the Act, 42 U.S.C. §§ 401-34, and for supplemental security income under Title XVI, 42 U.S.C. §§ 1381-83.

      Upon review of the record before this court, I conclude that the findings of fact and determinations of the Commissioner are supported by substantial evidence. The

decision of the Commissioner, therefore, should be affirmed and the applications for disability insurance benefits and supplemental security income denied.

## PROCEDURAL HISTORY

Claimant Timothy Joyner, who will be referred to by name, as plaintiff, or as claimant, filed his application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") on October 8, 2009, alleging disability beginning on July 6, 2006. T. 10.[1] Plaintiff's claim initially was denied and, upon reconsideration, the denial was upheld. Mr. Joyner appeared before an Administrative Law Judge ("ALJ") for a hearing on June 8, 2011. The ALJ likewise denied benefits. Claimant petitioned the Appeals Council of the Social Security Administration for a review of the ALJ's decision. The Appeals Council denied claimant's request for further review; as a result, the ALJ's decision became the final determination of the Commissioner.[2] T. 1.

## FINDINGS OF THE ALJ

In his written decision, the ALJ made a number of findings relative to the issues raised in this appeal:

• Claimant met the insured status requirements of the Social Security Act through June 30, 2010.

---

[1] The administrative record, as filed by the Commissioner, consists of 8 volumes (docs. 14-1 through 14-8), and has 367 consecutively numbered pages. References to the record will be by "T.," for transcript, followed by the page number.

[2] In reaching the decision not to further review plaintiff's case, the Appeals Council examined the additional evidence plaintiff submitted with his appeal, including a medical source statement and medical records from The Health Clinic dated May 9, 2011 through August 17, 2012. T. 2.

• Claimant has not engaged in substantial gainful activity since July 6, 2006, the alleged onset date.

• Claimant has the following severe impairments: status-post burn residuals, degenerative disk disease of the lumbar spine, phonological disorder, and posttraumatic stress disorder.

• Claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b) except he can lift, carry, push, and pull ten pounds frequently and twenty pounds occasionally; can frequently balance and crouch; can occasionally stoop, kneel, crawl, and climb ramps; cannot climb stairs; should avoid concentrated exposure to environments of extreme cold/heat and humidity; retains the ability to reach, handle, finger, and feel; can sit for no more than sixty minutes before having to stand and relieve discomfort for ten to fifteen minutes; can stand for no more than ten to fifteen minutes; can understand, remember, and carry out simple instructions and perform simple, repetitive one- to two-step tasks in low stress environment with occasional changes in work setting; can have little contact with the public; and might be required to be reminded of tasks once a day.

• Claimant was born on October 21, 1959, and was 46 years old, which is defined as a younger individual aged 18-49, on the alleged disability onset date. The claimant subsequently changed age category to closely approaching advanced age.

• Accordingly, claimant is not disabled.

## STANDARD OF REVIEW

A federal court reviews a Social Security disability case to determine whether the Commissioner's decision is supported by substantial evidence and whether the ALJ applied the correct legal standards. *See Lewis v. Callahan*, 125 F.3d 1436, 1439

(11th Cir. 1997); *see also Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."). Substantial evidence is "'such relevant evidence as a reasonable person would accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (*quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197 (1938)). With reference to other standards of review, the Eleventh Circuit has said that "'[s]ubstantial evidence is more than a scintilla . . . .'" *Somogy v. Comm'r of Soc. Sec.*, 366 F. App'x 56, 62 (11th Cir. 2010) (*quoting Lewis*, 125 F.3d at 1439). Although the ALJ's decision need not be supported by a preponderance of the evidence, "it cannot stand with a 'mere scintilla' of support." *See Hillsman v. Bowen*, 804 F.2d 1179, 1181 (11th Cir. 1986). Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. *See Sewell v. Bowen*, 792 F.2d 1065, 1067 (11th Cir. 1986). The reviewing court "'may not decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner] . . . .'" *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990) (*quoting Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)). Nevertheless, a reviewing court may not look "only to those parts of the record which support the ALJ[,]" but instead "must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." *See Tieniber v. Heckler*, 720 F.2d 1251, 1253 (11th Cir. 1983). In sum, review is deferential to a point, but the reviewing court conducts what has been referred to as "an independent review of the record." *See Flynn v. Heckler*, 768 F.2d 1273, 1273 (11th Cir. 1985); *see also Getty ex rel. Shea v. Astrue*, No.

2:10–cv–725–FtM–29SPC, 2011 WL 4836220 (M.D. Fla. Oct. 12, 2011); *Salisbury v. Astrue*, No. 8:09-cv-2334-T-17TGW, 2011 WL 861785 (M.D. Fla. Feb. 28, 2011).[3]

The Social Security Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).[4] To qualify as a disability, the physical or mental impairment must be so severe that the plaintiff not only is unable to do his previous work, "but cannot, considering [his] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)-(g), the Commissioner analyzes a disability claim in five steps:

1. If the claimant is performing substantial gainful activity, he is not disabled.

2. If the claimant is not performing substantial gainful activity, his impairments must be severe before he can be found disabled.

3. If the claimant is not performing substantial gainful activity and he has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if his impairments meet or medically equal the criteria of

---

[3] The Eleventh Circuit not only speaks of an independent review of the administrative record, but it also reminds us that it conducts a *de novo* review of the district court's decision on whether substantial evidence supports the ALJ's decision. *See Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1260 (11th Cir. 2007); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002).

[4] Claimant is seeking both DIB under Title II of the Social Security Act, 42 U.S.C. §§ 401-34, and SSI under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-83. For purposes of determining whether a plaintiff is disabled, the law and regulations governing a claim for DIB are identical to those governing a claim for SSI. *Patterson v. Brown*, 799 F.2d 1455, 1456 n.1 (11th Cir. 1986). All references to statutes and rules in this order will be to those addressing DIB.

any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.   If the claimant's impairments do not prevent him from doing his past relevant work, he is not disabled.

5.   Even if the claimant's impairments prevent him from performing his past relevant work, if other work exists in significant numbers in the national economy that accommodates his residual functional capacity and vocational factors, he is not disabled.

Claimant bears the burden of establishing a severe impairment that keeps him from performing his past work.  *Chester v. Bowen*, 792 F.  2d 129, 131 (11th Cir. 1986).   The Eleventh Circuit has explained the operation of step five.  *See Doughty v. Apfel*, 245 F.3d 1274, 1278 n.2 (11th Cir. 2001) ("In practice, the burden temporarily shifts at step five to the Commissioner.  The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform.  In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists.  The temporary shifting of the burden to the Commissioner was initiated by the courts and is not specifically provided for in the statutes or regulations.  *See Brown v. Apfel*, 192 F.3d 492, 498 (5th Cir. 1999) (quoting *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987) ('The shifting of the burden of proof is not statutory, but is a long-standing judicial gloss on the Social Security Act')).").

At step five, even where one or more severe impairments are established, the claimant must show that he cannot perform work within that residual functional capacity.  The ALJ establishes residual functional capacity, utilizing the impairments

identified at step two, by interpretation of (1) the medical evidence, and (2) the claimant's subjective complaints (generally complaints of pain).  Residual functional capacity is then used by the ALJ to make the ultimate vocational determination required by step five.[5]  "[R]esidual functional capacity is the most [claimant] can still do despite [claimant's] limitations."[6]  20 CFR § 404.1545(1).  Often, both the medical evidence and the accuracy of a claimant's subjective complaints are subject to a degree of conflict, and that conflict leads, as in this case, to the points raised on judicial review by many disappointed claimants.

---

[5] "Before we go from step three to step four, we assess your residual functional capacity. (See paragraph (e) of this section.)  We use this residual functional capacity assessment at both step four and step five when we evaluate your claim at these steps."  20 C.F.R. § 404.1520(a)(4).

[6] In addition to this rather terse definition of residual functional capacity, the Regulations describe how the Commissioner makes the assessment:

> (3) Evidence we use to assess your residual functional capacity.  We will assess your residual functional capacity based on all of the relevant medical and other evidence. In general, you are responsible for providing the evidence we will use to make a finding about your residual functional capacity.  (See § 404.1512(c).)  However, before we make a determination that you are not disabled, we are responsible for developing your complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help you get medical reports from your own medical sources.  (See §§ 404.1512(d) through (f).) We will consider any statements about what you can still do that have been provided by medical sources, whether or not they are based on formal medical examinations. (See § 404.1513.)  We will also consider descriptions and observations of your limitations from your impairment(s), including limitations that result from your symptoms, such as pain, provided by you, your family, neighbors, friends, or other persons.  (See paragraph (e) of this section and § 404.1529.)[.]

20 C.F.R. § 404.1545(a)(3).

## FACT BACKGROUND AND MEDICAL HISTORY[7]

Claimant testified at a vocational hearing on June 8, 2011.  T. 35.  He was fifty-two at the time of the hearing.  T. 53.  On July 6, 2006, claimant suffered severe burns throughout his entire body which caused blood to "pour out" of his feet, knees, and hands.  T. 45-47.  His lips were burned off.  T. 51.  His legs required 450 staples in them, but the palms of his hands are "all right."  T. 45, 48.  As a result of his burns, he has to keep his skin covered and has difficulty sweating and cooling down if he goes outside.  T. 46.  When claimant is out in the heat, his skin tingles and will itch if he sweats.  T. 46, 52.  He also "freeze[s] to death" because he has "no heating system in [his] body . . . ."  T. 46.  When he is inside in the air conditioning, however, he does not experience any pain from the burns, except in his legs.  T. 52. As of the date of the hearing, plaintiff does not have problems walking.  T. 47.  He believes that the burns damaged his nerve endings, and he has to constantly move around because he cannot sit still for very long.  T. 47.  When he stands up, he feels a tingling sensation running down his legs which stops when he sits down.  T. 48.  He often has decreased sensation in his legs and on occasion his legs go numb.  T. 51.  Plaintiff estimates he can sit for an hour, at most, and needs to stand  up every fifteen minutes to get his blood circulating.  T. 57.

Claimant wakes up in the middle of the night because of the stress resulting from his burn injuries and often has flashbacks to the burn incident.  T. 50.  Plaintiff feeds his cat, but does not do yard work or sweep the house.  T. 59.  His wife[8] handles

---

[7] The recitation of the medical and historical facts of this case is based upon the court's independent review of the record.

[8] Plaintiff is not consistent on whether he is married.  He often mentions a wife, but at one point during the hearing, he mentions that he is not married and has a girlfriend.  T. 67.  Further, in

the finances and "do[es] everything" for him, including getting groceries.  T. 50, 59.

Unfortunately, at the time of the hearing, the plaintiff's wife was in the hospital

recovering from a stroke.   T. 50.   For nearly forty years, plaintiff operated a

bulldozer;[9] but he had to sell the business because he was unable to "run it."  T. 53.

Claimant testified that he last worked in 2007 and 2008 after he suffered severe burns

but had to stop working because of the side effects from his burns and the back pain

he experienced "running heavy equipment."  T. 42.   He would try to operate the

bulldozer in the morning or late afternoon but was unable to be out in the sun and

heat.  T. 43.  Plaintiff now stays around his house because he "can't do nothing

much" and leaves his house "very seldom[ly]."  T. 53, 58.  His typical day consists

of feeding the birds or staring out the window watching the traffic.  He admits he can

sit, stand, and walk around.   T. 54.  Claimant also admits that his arms "still got

strength," but his back limits how much he can lift.  T. 54.  In claimant's estimation,

he can lift twenty to twenty-five pounds before it starts to hurt "bad."  T. 55.  He can

lift five pounds with no pain and bend down to pick something up, but he cannot walk

up and down stairs.  T. 55, 57-58.  Plaintiff believes that he cannot stand up and walk

for six hours in a day or work a sit down job for eight hours a day.  T. 56, 60.

Vocational Expert Gail Jarrell also testified at the hearing.  T. 61.  Jarrell found

plaintiff's former occupation of bulldozer operator to be "heavy."  T. 63.  The ALJ

instructed Jarrell to assume someone of plaintiff's age, educational background, and

---

his application summary for disability insurance benefits and supplemental security income, plaintiff
notes that he has never been married.  T. 152, 159.

[9] Plaintiff completed the seventh grade, but dropped out of school prior to finishing the eighth
grade.  T. 43-44.  He barely is able to write and has difficulty reading, although he is able to read
slowly.  T. 60.

work experience, as well as someone who could perform a range of light work with the following limitations: lift, carry, push, pull ten pounds frequently, twenty pounds occasionally; occasionally climb ramps but no stairs; limited to occasional stooping, kneeling, and crawling; frequent balancing and crouching; should avoid concentrated exposure to environments such as extreme cold, extreme heat, and humidity; no manipulative limitations, retaining the ability to reach, handle, finger, and feel; able to sit for no more than sixty minutes before having to stand for ten to fifteen minutes to relieve any discomfort; can stand for no more than ten to fifteen minutes; able to understand, remember, and carry out simple instructions and perform simple, repetitive one-to two-step tasks; requires a low stress environment, defined as only occasional changes in work setting; limited contact with the public; and must be reminded of tasks and to stay on task at least once a day.  T. 63-64.  The ALJ, after further instructing that the assumed individual would be unable to perform past relevant work, inquired about work available for someone with that assessed residual functional capacity and profile.  T. 64.  In response, Jarrell questioned whether a categorization of light work would be appropriate given the limitations.  T. 64.  In Jarrell's opinion, a limitation that an individual could stand for only ten to fifteen minutes before having to sit for "like [sixty] minutes" would be more indicative of a sedentary residual functional capacity than a light work residual functional capacity. T. 64.  In turn, the ALJ merely stated "okay" before allowing Jarrell to continue with the hypothetical.  T. 64.  Jarrell then said that such an individual could work as a small products assembler, companion, or office helper.[10]  T. 64-65.  Jarrell further

_____

[10] Jarrell deviated from the Dictionary of Occupational Titles ("DOT") in certain respects. For small products assembler, Jarrell listed only those available jobs that would be classified as

found that the claimant had no transferable job skills from his past relevant work.  T. 65.

## MEDICAL EVIDENCE

In a supplemental pain questionnaire completed on October 12, 2009, plaintiff indicated he had a lack of pigment over sixty-five percent of his entire body, was "very" sensitive to heat, and would become numb and tingle in his hands, feet, neck, and behind his knees when exposed to heat and other extreme elements.  T. 184.  He noted that he experiences pain when he stands for long periods of time, bends his knees, turns his head, or has to grasp and hold something with his hands.  T. 184-86. He is in pain daily, "depending on activities," and sometimes the pain can be "extreme," but he only takes over-the-counter pain medications, such as Motrin, Tylenol P.M., and Ibuprofen, because he lacks medical insurance and cannot afford prescription medication.  T. 185.  On October 12, 2009, plaintiff's girlfriend, Tracey Carmichael, also completed a supplemental pain questionnaire.  T. 187-89. Carmichael indicated that she cooks the meals, does the housecleaning and laundry, does the shopping, and does the gardening and yard work.  T. 188.  Claimant is able to bathe himself and drive short distances but does not participate in any social activities or hobbies.  T.188.  At home, plaintiff will sit or lay in his recliner, walking only when necessary, and will stand for short periods of time due to numbness in his legs.  T. 189.

Plaintiff submitted a Work Activity Report dated October 8, 2009, in which he indicated he was self-employed and had been working since March 2007.  T. 191,

---

"sedentary," unskilled instead of light.  Jarrell identified the "light" job numbers for companion, but only the "sedentary" job numbers for office helper.

197. Plaintiff is limited on the days he can work and has lost "several" jobs because he missed deadlines. T. 192. When plaintiff did work, he completed "all work" himself but had an unpaid assistant who took care of his injuries, property, and pets. T. 192. In a subsequent disability report,[11] plaintiff indicated that he worked twenty hours a week from March 2007 until the date of the report. T. 197. In a disability report for his appeal, completed on January 21, 2010, plaintiff listed his medications as Hydrocodone, Tylenol PM, and Xanax.[12] In a phone conversation on January 26, 2010, Carmichael stated that plaintiff has concentration issues "secondary" to the pain he experiences from his burns. T. 221. She further indicated that plaintiff cannot pay his bills or handle his finances and has a limited education. T. 221. Carmichael expressed that plaintiff could drive, bathe and shave himself, dress himself, and do "small" chores around the house and yard. T. 221.

Plaintiff's initial burn records from Northwest Florida Community Hospital, completed on July 6, 2006, indicate plaintiff was burned on thirty to thirty-five percent of his body. T. 239. Specifically, the hospital noted burns to his face, neck, arms, legs, hands, and feet. T. 239. Claimant was admitted to Shands Hospital on July 7, 2006, and discharged on August 1, 2006. T. 251, 253. The discharge note diagnosed forty-five percent "total body surface burn to the face, bilateral upper extremities, bilateral lower extremities and chest." T. 251, 253. Additional Shands clinical records, completed on August 9, 2006 during a follow-up visit, indicated

---

[11] The report is not dated, but appears to have been completed on January 25, 2010.

[12] In an interview dated January 26, 2010, Carmichael stated that she filled out the form for the claimant and accidentally indicated that he took Xanax. In reality, Carmichael is the one prescribed Xanax. T. 221.

"adaptic and aces on both legs; nothing on arms." T. 248. During subsequent follow-up visits, it was noted that claimant's skin grafts were healing "well" and no further grafts were required at that time. T. 243, 247, 250. Plaintiff was advised to protect himself from the environment, sun, and friction. T. 247, 250.

On December 22, 2009, plaintiff visited Dr. Samuel Ward for a disability determination. T. 269. Dr. Ward assessed plaintiff with a limited range of motion in his ability to rotate (limited to fifty degrees to the right and forty degrees to the left out of a possible 80 degrees) and in his forward flexion of the lumbar spine (limited to eighty degrees to both his left and right out of a possible ninety degrees). T. 270. Dr. Ward also found claimant slightly limited in his hip flexion movement (with full movement to his right and limited to ninety degrees movement to his left), but with regular movement in every other respect. T. 270-72. Dr. Ward noted claimant had pain in his upper and lower extremities, tingling and numbness in his feet, extreme heat and cold intolerance, and did not need an assistive device to walk or stand; he diagnosed claimant with lumbago and lower back pain. T. 273.

Kimberly L. Booker, a single decisionmaker, reviewed plaintiff's files and completed a Physical Residual Functional Capacity Assessment on December 30, 2009. T. 276. Booker found plaintiff could occasionally lift fifty pounds, frequently lift twenty-five pounds, stand and/or walk for about six hours in an eight hour work day, sit for about six hours in an eight hour work day, and push and/or pull an unlimited amount other than the limitations set forth concerning lifting and carrying. Booker also noted that plaintiff's extremities were normal and that plaintiff had full strength in both the upper and lower extremities. Plaintiff's "sensory" was "intact" except in the areas of scars from the burns, his gait was normal, and he did not use an

assistive device.  T. 276.  Booker found no postural limitations, no manipulative limitations, no visual limitations, no communicative limitations, and no environmental limitations.  T. 277-79.  Booker noted plaintiff reported pain all over his body and that his legs got numb, but he expressed skepticism with some of plaintiff's statements.  Booker, therefore, only assigned plaintiff partial credibility but concluded that his symptoms were attributable to a medically determinable impairment.  T. 280.

On February 19, 2010, claimant visited Diana Benton, a clinical psychologist, for a General Clinical Evaluation with Mental Status.  T. 283.  Dr. Benton noted that claimant's girlfriend drove him to the interview and that he acted appropriately with office staff and was cooperative.  T. 283.  Claimant reported difficulty with being in a crowd and frequent nightmares about being burned.  He further reported that he made active efforts to avoid "things" and conversations that reminded him of the burn incident, felt a sense of estrangement and detachment from others, and had diminished participation in activities, difficulty sleeping, fatigue, and a depressed mood.  T. 284.  In terms of daily living, claimant could drive; perform all "necessary" self-care daily living activities, including bathing, dressing, and eating; and was able to clean around the house, including sweeping, mopping, and vacuuming.  T. 284. He had difficulty doing any activity featuring running water, such as washing dishes, because it caused him pain.  T. 284.  On a typical day, plaintiff just sat around his house and tried to stay warm but would go outside and "do something" if the weather was "decent."  As for his social life, plaintiff indicated that he saw his dad "about every day," his mom "about once a week," and spoke with a friend on the phone "about once a week."  T. 284.  Dr. Benton noted plaintiff's gait and posture were

unremarkable, he had no pain behaviors, he spoke at a normal rate and tone, he had a significant speech impediment but his speech was understandable, and he had "some" difficulty hearing.  T. 285.  Dr. Benton diagnosed post traumatic stress disorder ("PTSD") and phonological disorder and assigned a global assessment functioning ("GAF") score of 53.[13]  T. 285.

On February 23, 2010, Dr. John Dawson completed an additional Physical Residual Functional Capacity Assessment. T. 288.  Dr. Dawson determined plaintiff could occasionally carry fifty pounds, frequently lift twenty-five pounds, stand about six hours in an eight-hour workday, and was not limited in his ability to push and/or pull.  T. 289.  Dr. Dawson noted that plaintiff did not need assistive devices, his sensation was intact except for the areas scarred over, his manipulation was intact, he was able to heel/toe walk, had an unremarkable gait and posture, and had no pain behaviors or involuntary movements.  T. 289-90.  Dr. Dawson found plaintiff had no postural limitations, no manipulative limitations, no visual limitations, no communicative limitations, and no environmental limitations.  T. 290-92.  Dr. Dawson further found plaintiff's reported symptoms only partially credible but attributed them to a medically determinable impairment that limited plaintiff's residual function.  T. 293.  Nevertheless, Dr. Dawson characterized the severity of plaintiff's complaints as "disproportionate" given the evidence of record and reduced

---

[13] A GAF between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. The American Psychiatric Association, <u>Diagnostic and Statistical Manual of Mental Disorders</u> 32 (4th ed. 1994).  However, the most recent edition of the Diagnostic and Statistical Manual no longer recommends use of the GAF scale, acknowledging that "[i]t was recommended that the GAF be dropped from DSM-5 for several reasons, including its conceptual lack of clarity and questionable psychometrics in routine practice." American Psychiatric Association, <u>Diagnostic and Statistical Manual of Mental Disorders</u> 16 (5th ed. 2013).

his RFD accordingly.[14]  T. 293.  On the case development sheet, Dr. Dawson opined that plaintiff's burns did not significantly impact his ability to function daily.[15]  T. 316.

On March 30, 2010, medical consultant Dr. Robert Schilling conducted a Mental Residual Functional Capacity Assessment.  Dr. Schilling found plaintiff "not significantly limited" except with regard to his ability to understand, remember, and carry out detailed instructions; maintain concentration for extended periods of time; complete a normal work-day and work-week without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; and respond appropriately to changes in work setting–with respect of each of which Dr. Schilling found the plaintiff moderately limited.  T. 296-97. Specifically, Dr. Schilling determined that plaintiff had a limited ability to remember complex or detailed instructions but could understand, remember, and carry out simple one- and two-step instructions; had mild to moderate limitations in his memory processes; was able to perform work in a stable environment; had mild to moderate difficulty working within a work schedule and at a consistent pace; was able to maintain regular attendance at work, be punctual, and not require special

---

[14] Dr. Dawson opined that the statements put forward by the plaintiff and others, observations concerning plaintiff's daily living activities, and "alterations of usual behavior or habits" were disproportionate "to the expected severity and duration that would be expected on basis of claimant's medically determinable impairment."  T. 293.

[15] Dr. Dawson took issue with Dr. Ward's examination and called it "awful."  T. 316.  Dr. Dawson advocated for a better assessment of plaintiff's range of motion over his joints, including his ankles and knees.  T. 316.

supervision in order to sustain a work routine; might have difficulty adapting to change in the work environment; had limited ability to socially interact; and should have limited exposure to the general public during "episodes of exacerbated symptoms." T. 298. Dr. Schilling noted organic mental disorders and anxiety-related disorders but concluded that claimant was able to meet the "basic mental demands of competitive work on a sustained basis" despite any limitations stemming from his impairments. T. 298, 300. Dr. Schilling diagnosed phonological disorder and PTSD. Further, Dr. Schilling found plaintiff "mild[ly]" limited in his "restriction of activities of daily living," "moderate[ly]" limited in the areas of "difficulties in maintaining social functioning" and "difficulties in maintaining concentration, persistence, or pace," and not limited at all in "episodes of decompensation, each of extended duration." T. 310. Dr. Schilling concluded that while plaintiff may continue to experience some anxiety and phonological disorder at times, "[he] remains functional from a mental perspective and acknowledges the ability to perform many routine [activities of daily living] independently." T. 312. Based on the totality of the evidence, Dr. Schilling judged plaintiff "to be capable of independent functioning" with no indication of a mental impairment that would meet or equal a listing. T. 312.

Plaintiff also sought monthly treatment and prescription refills from advanced registered nurse practitioner Seay at The Health Clinic from January 2011 through August 2012. T. 318-21, 342-61. Plaintiff first visited ARNP Seay on January 17, 2011 and indicated he had pain in his neck, numbness and tingling in his hands, pain in his lumbar spine and lower back, and pain radiating down his legs. T. 321. ARNP Seay ordered x-rays of plaintiff's spine, 7.5 milligrams of Lortab, 500 milligrams of Robaxin, and a heating pad. T. 321. During subsequent monthly checkups, plaintiff

continued to complain of pain in his lower back and lumbar spine and decreased range of motion in his back, but he was in "no acute distress." T. 318-21, 342-61. Seay diagnosed claimant with anxiety, lumbago, and OA/DJD[16] on several visits, and later diagnosed chronic obstructive pulmonary disease ("COPD"). T. 318-21, 346-52. Seay generally prescribed Lortab and Xanax and occasionally prescribed Spiriva and Neurontin. On November 23, 2011, plaintiff visited ARNP Seay for a Physical Capacities Evaluation. T. 341. This PCE indicated that plaintiff could sit, stand, or walk for one hour at a time and for only one hour in an eight-hour day. T. 341. Plaintiff could occasionally lift or carry between eleven and twenty pounds. T. 341. Seay found no limitations with the hands, but an inability to do repetitive movements, such as pushing and pulling, with the feet. T. 341. Claimant went to the Bay Medical Center Emergency Department on December 27, 2011, complaining of shortness of breath. T. 364. He was determined to have a full range of motion in all extremities and subsequently diagnosed with tobacco dependence syndrome and chronic obstructive lung disease. T. 364.

On July 13, 2011, Dr. Carla M. Holloman conducted a physical consultative examination of claimant. T. 328. Dr. Holloman noted hearing loss, speech impediment, chest pain and shortness of breath associated with back pain, and numbness and tingling in claimant's extremities. T. 329. Dr. Holloman found grip and muscle strength to be "5/5 throughout," spine and extremities to be in "good" alignment, "no paravertebral tautness and tenderness . . . in the lumbosacral spine," and no range of motion limitations. T. 329-33. In a Medical Source Statement of

---

[16] OA/DJD is nomenclature for osteoarthritis or degenerative joint disease.

Ability to Do Work Related Activities, Dr. Holloman found plaintiff able to frequently lift or carry between 51 and 100 pounds and continuously lift all lower weights. Plaintiff was able to sit, stand, and walk for a total of eight hours in an eight-hour work day. T. 335. He had no restrictions on the use of his hands or feet and was determined to be able to perform a variety of daily activities. T. 339. Dr. Holloman noted, however, that claimant had "poor overall condition due to respiratory status." T. 334.

Lumbar spine X-rays on May 25, 2011, showed: 1) vertebral spondylosis and spondyloarthropathy of the lower lumbar and lumbosacral segments, 2) degenerative disk disease with disk narrowing and vacuum disks at L4-L5, and 3) posterior osteophyte of the posterior cortex of L4 at the L4-L5 level that could be narrowing the spinal canal. T. 322. A lumbar MRI on June 20, 2011, evidenced: 1) at L4-5, moderately-severe degeneration of especially the left side of the disk, stenosis of the left foramen, posterolateral protrusion/spur that was at least contacting the L4 nerve root which might have been displaced, a small and wide posterior disk protrusion causing mild deformity of the thecal sac that was affecting both L5 nerve roots, worse on the left, 2) at L2-3, mild disk degeneration worse in the right lateral position, a right posterior and posterolateral disk herniation causing deformity of the right side of the thecal sac and extending very close to the right L2 nerve root in the foranina, 3) at L3-4, mild degeneration of especially the right lateral portion of the disk, a small combination of protrusion and spur that extended into the right foramen very close to the L3 nerve root, very mild deformity of the thecal sac that could affect either of the L4 nerve roots, and 4) at L1-2, a small left posterior disk herniation that caused very minor deformity of the thecal sac. T. 325-26.

ANALYSIS

Plaintiff argues that the ALJ's decision is not supported by substantial evidence and that the ALJ erred in: 1) finding plaintiff not credible, 2) failing to consider the impact of plaintiff's spinal condition on the functional capacity limitations, and 3) deeming a residual functional capacity for sedentary exertional limitations to be permitting of light work. (Doc. 18, p. 8).

Credibility

Plaintiff first argues that the ALJ's credibility determination was "improper." He characterizes the cited reasons for finding plaintiff's subjective complaints not credible as unsupported by the record and violating the requirements of SSR 96-7p and *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). (Doc. 18, pp. 8-9).

Pain is treated by the Regulations as a symptom of disability. Title 20 C.F.R. § 404.1529 provides, in part, that the Commissioner will not find disability based on symptoms, including pain alone, "unless medical signs or findings show that there is a medical condition that could be reasonably expected to produce these symptoms." *Accord* 20 C.F.R. § 416.929. The Eleventh Circuit has articulated the three-part pain standard, sometimes referred to as the *Hand*[17] test, as follows:

> In order to establish a disability based on testimony of pain and other symptoms, the claimant must satisfy two parts of a three-part test showing: (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain.

---

[17] *Hand v. Bowen*, 793 F.2d 275, 276 (11th Cir.1986) (the case originally adopting the three-part pain standard).

*Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002) (citing *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991)); *Adamo v. Comm'r of Social Sec.,* 365 F. App'x 209 (11th Cir. 2010) (quoting *Wilson*); *Elam v. Railroad Retirement Bd.*, 921 F.2d 1210, 1216 (11th Cir. 1991). The Eleventh Circuit also has approved an ALJ's reference to and application of the standard set out in 20 C.F.R. § 404.1529 because that regulation "contains the same language regarding the subjective pain testimony that this court interpreted when initially establishing its three-part standard." *Wilson,* 284 F.3d at 1226. Thus, failure to cite to an Eleventh Circuit standard is not reversible error so long as the ALJ applies the appropriate regulation.

If the Commissioner refuses to credit subjective testimony of the plaintiff concerning pain, he must do so explicitly and give reasons for his decision in that regard. *MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986). Where he fails to do so, the Eleventh Circuit has stated that it would hold as a matter of law that the testimony is accepted as true. *Holt*, 921 F.2d at 1223; *MacGregor*, 786 F.2d at 1054. Although the Eleventh Circuit does not require an explicit finding as to a claimant's credibility, the implication must be obvious to the reviewing court. *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). The credibility determination does not need to cite particular phrases or formulations, but it cannot merely be a broad rejection, which is not enough to enable the reviewing court to conclude that the ALJ considered the claimant's medical condition as a whole. *Dyer*, 395 F.3d at 1210 (11th Cir. 2005) (internal quotations and citations omitted). And of course, the reasons articulated for disregarding the plaintiff's subjective pain testimony must be based upon substantial evidence. *Wilson*, 284 F.3d at 1225-26; *Jones v. Dep't of Health*

*and Human Servs.*, 941 F.2d 1529, 1532 (11th Cir. 1991); *Hurley*, 385 F. Supp. 2d at 1259.

Plaintiff argues that the ALJ erred by relying in part on plaintiff's lack of medical treatment to diminish his credibility while failing to consider monetary difficulties that may have affected his medical treatment. (Doc. 18, p. 9). Plaintiff further contends that the ALJ erred in determining that plaintiff's statements concerning his activities of daily living were inconsistent and in discounting his credibility because of plaintiff's attempted return to work. (Doc. 18, p. 10). Contrary to plaintiff's view, the ALJ spent significant time discussing credibility and considered a variety of factors in concluding that plaintiff's credibility should be discounted. The ALJ first explained how the objective medical records were not consistent with plaintiff's own statements concerning "the intensity, persistence, and limiting effects of his symptoms." T. 17. The ALJ then addressed the hospital burn records from Shands Hospital in 2006, including the follow-up visits with the advanced registered nurse practitioner, the plaintiff's visits at The Health Clinic, and the MRI and x-rays of plaintiff's lumbar spine. T. 17. Additionally, the ALJ considered the medical consultive evaluations completed by Dr. Ward in December 2009 and Dr. Holloman in July 2011, as well as the psychological evaluation completed by Dr. Benton in February 2010. T. 18. The ALJ next turned to claimant's reported activities of daily living, third-party descriptions of plaintiff's daily activities, various inconsistencies in testimony from both the claimant and a third party (Carmichael), and the claimant's medication regimen. T. 18-19. The ALJ considered the medical opinions of Drs. Holloman, Dawson, Benton, and Schilling

and indicated the weight afforded to each.[18]  T. 19-20.  In his summation, the ALJ noted that he considered "the medical signs and findings in the record, the claimant's reported daily activities, the minimal mental health treatment history, the claimant's medical regimen, and the opinions of the consultative examiners and state agency consultants" in determining that the claimant's credibility should be discounted.  T. 20.

Contrary to plaintiff's assertions, his several year gap in medical treatment also suggests that his limitations were less serious than he alleges and therefore was properly considered by the ALJ.  Although plaintiff may have been limited financially in his ability to visit a doctor or afford treatment, such facts do not undermine the entirety of the evidence suggesting plaintiff's limitations are less significant than alleged.  Further, plaintiff's attempts to return to work after being burned evidence that plaintiff felt himself capable–to some degree–of working again and is relevant to the severity and extent of plaintiff's alleged injuries and limitations.  Accordingly, the ALJ's discussion of the relevant medical and opinion evidence, T. 15-20, and the undersigned's own review of the evidence demonstrate that the ALJ's decision to discount plaintiff's credibility was based on substantial evidence.  The ALJ explicitly rejected plaintiff's subjective complaints and gave reasons for doing so, consistent with the applicable law and regulations.  *See Foote*, 67 F.3d at 1562 ("A clearly

---

[18] Importantly, the ALJ was not alone in finding that some of plaintiff's statements lacked credibility.  Dr. Dawson expressed hesitation with the claimant's credibility, stating "[t]here are some allegations and symptoms that appear in my judgment, to be disproportionate to the expected severity and duration that would be expected on [the] basis of the claimant's medically determinable impairments."  T. 293.  Similarly, Kimberly Booker indicated in her functional capacity assessment that some of claimant's statements "are reasonable" but others were "disproportionate" and therefore assigned claimant only "partial credibility."  T. 280.

articulated credibility finding with substantial supporting evidence in the record will not be disturbed by a reviewing court.") (citing *MacGregor*, 786 F.2d at 1054). As such, plaintiff's first claim fails.

<u>Plaintiff's Lumbar Spine Limitations</u>

Plaintiff next argues that the ALJ failed to "properly account for limitations related to Plaintiff's lumbar spine disk herniations with nerve root involvement." (Doc. 18, p. 12). Specifically, plaintiff takes issue with the Commissioner's alleged rejection of and failure to consider various materials completed by ARNP Seay (*see* T. 340-67) and submitted to the Appeals Council following the ALJ's initial decision. (Doc. 18, p. 12). Plaintiff seeks to classify Seay as a treating source and alleges that her evaluation "was a significant addition to the evidentiary records, and should have been considered consistent with SSR 06-3p;" thus, by failing to consider Seay's evaluation, the Commissioner did not "properly account for [p]laintiff's spinal impairments in the residual functional capacity." (Doc. 18, pp. 12-13). Finally, plaintiff seems to argue–in a footnote–that various medical opinions were incomplete or issued on the basis of an incomplete record because the doctors might not have reviewed the x-rays or MRI of plaintiff's lumbar spine. (Doc. 18, p. 12).

As to ARNP Seay, the regulations limit who can be considered an "acceptable medical source." *See* 20 C.F.R. §§ 404.1513, 416.927; SSR 06-03P, 2006 WL 2329939 (delineating "acceptable medical sources" and not including nurse practitioners). Because the regulations do not allow for a nurse to be considered "an acceptable medical source[]," the ALJ did not err by failing to categorize Seay's findings as from a treating source. *See* 2006 WL 2329939; *see also Ithier v. Astrue*, No. 1:11-cv-238-GRJ, 2013 WL 1092197, at *6 (N.D. Fla. March 14, 2013)

("Because Mohan is a nurse practitioner and not a treating physician, the ALJ was not required to evaluate his opinion as a treating physician's statement."). As a result, Seay's opinion would not be entitled to controlling weight. Additionally, Nurse Seay's evaluation is inconsistent with her own treatment records from The Health Clinic. Seay noted that plaintiff had lumbar spine and lower back pain and diagnosed OA/DJD, anxiety, lumbago, muscle spasms, and COPD. Nurse Seay treated the pain mainly with Lortab, occasionally with Xanax, and in some instances Neurontin. Nurse Seay's evaluation, however, finds plaintiff able to sit, stand, or walk for only one hour during an eight-hour day and only one hour at a time. Such dramatic restrictions are not consistent with Nurse Seay's diagnoses or treatment regimen, which indicate an individual with mild to moderate back and lumbar spine pain. Moreover, the restrictions imposed by Seay are significantly more restrictive than any other medical opinion of record and inconsistent with the mild to moderate findings of plaintiff's x-rays and MRI.[19] Because Nurse Seay's findings are inconsistent with the medical record as a whole, Nurse Seay's evaluation, even if considered by the ALJ, would have been greatly discounted and could not reasonably have changed the ALJ's RFC determination.[20]

---

[19] Dr. Ward's evaluation, T. 269-72, Kimberly Booker's functional capacity assessment, T. 275-82, Dr. Dawson's functional capacity assessment, T. 288-95, Dr. Holloman's physical consultative examination, T. 328-39, Dr. Schilling's psychiatric review, T. 300-12, an x-ray of plaintiff's lumbar spine, T. 322, and an MRI of plaintiff's lumbar spine, T. 325-26, all show plaintiff less limited than his testimony and statements suggest. The only medical evidence consistent with plaintiff's claimed limitations is a single page physical capacities evaluation completed by Nurse Seay that is inconsistent with the majority of her own medical records evidencing mild to moderate impairments. T. 341.

[20] To the extent plaintiff argues that Nurse Seay's evaluation is "material" information warranting remand under 42 U.S.C. § 405(g), the foregoing discussion affirms that Nurse Seay's

Plaintiff's other argument concerning the various medical opinions is similarly unfounded. The ALJ found plaintiff's degenerative disk disease of the lumbar spine a severe impairment and considered plaintiff's degenerative disk disease in determining plaintiff's RFC. T. 13, 15-20. The ALJ discussed the x-rays and MRI of plaintiff's lumbar spine and used them to determine plaintiff's RFC. T. 17. The ALJ gave "little weight" to Dr. Dawson's medical opinion, in part because he did not have the opportunity to review the diagnostic imaging evidence.[21] T. 20. Further, although Dr. Holloman examined plaintiff several weeks after the x-rays and MRI were taken, the ALJ discounted Dr. Holloman's opinion in part based upon the ALJ's own understanding of the "diagnostic imaging data."[22] Within the RFC assigned, the ALJ found more exertional and postural limitations than did Dr. Holloman. T. 19. The ALJ then accounted for such in the RFC. Accordingly, plaintiff's second claim also fails.

Capability of Performing Light Work

The plaintiff also takes issue with the ALJ's determination that he was capable of performing light work with certain restrictions. Plaintiff argues that the RFC

---

evaluation would not be considered material for the purposes of § 405(g). *See Caulder v. Bowen*, 791 F.2d 872, 877 (11th Cir. 1986) (defining material evidence as evidence that is "relevant and probative so that there is a reasonable possibility that it would change the administrative result").

[21] Plaintiff also points to Dr. Dawson's critique of Dr. Ward's evaluation but ignores Dr. Dawson's own findings, which ultimately were less restrictive than the ALJ's assessed RFC.

[22] The MRI, to be sure, sets out significant findings. Viewed alone, these findings could not help but impress a lawyer (or a judge) with experience in medical and disability matters. Nevertheless, as the Commissioner points out, no evidence of record supports a conclusion that plaintiff experienced disabling limitations as a result of the lower back. (Doc. 19, p. 16). Moreover, Dr. Holloman examined plaintiff several weeks after the MRI and found no significant musculoskeletal or neurological defects. T. 329-333.

determination imposed specific limitations–that plaintiff can sit for no more than sixty minutes before having to stand for ten to fifteen minutes and can stand for no more than ten to fifteen minutes–that would effectively preclude a finding that he is capable of performing work at the "light" level. (Doc. 18, pp. 13-14). The Commissioner's regulations define "light work," in part, as follows:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b). Plaintiff argues that the assigned RFC limits him to standing for a maximum of two hours in an eight-hour work day (or potentially less than that if plaintiff stood for fifteen minutes after sitting for sixty minutes). This contention, however, incorrectly interprets the standing requirements for light work as absolute. The Commissioner's regulations specifically provide that "a job is in this [light work] category when it requires a good deal of walking or standing, *or* when it involves sitting most of the time with some pushing and pulling of arm or leg controls." § 404.1567(b) (emphasis and alterations added). Importantly, the ALJ's assessed RFC imposes only mild limitations on plaintiff's ability to push and pull; specifically, plaintiff can lift, carry, push, and pull ten pounds frequently and twenty pounds occasionally. T. 15. These limitations meet the definitional push and pull requirements of light work. *See* SSR- 83-10. In other words, a light job may feature

substantial standing or walking or, in the alternative, consist primarily of sitting with limited walking and standing. *See Turner v. Astrue*, No. 5:07cv09/RS-EMT, 2008 WL 595943, at *12-13 (N.D. Fla. Feb. 29, 2008) (affirming the ALJ's determination that the claimant could do the "light" job of cashier despite only being able to stand and walk for four hours in an eight-hour workday).[23]

At the hearing, Vocational Expert Jarrell, given claimant's assessed RFC, attempted to determine what occupations plaintiff was capable of performing given the prescribed limitations. After the ALJ described the claimant's RFC, Jarrell responded:

> [Jarrell]: Well, I have a question because you said light work but then the standing is only for 10 or 15 minutes before having to sit for like 60 minutes, is it?
>
> [ALJ]: Yes.
>
> [Jarrell]: So it's really a sedentary RFC.
>
> [ALJ]: Ok.
>
> [Jarrell]: Then I would state under that hypothetical such an individual would be able to work as a small products assembler I. The <u>DOT</u> is 706.684-022. The <u>DOT</u> has it at light with an SVP: 2, unskilled. And I would have to deviate from the <u>DOT</u> and only identify the number for sedentary, unskilled. In

---

[23] Similar to *Turner*, here, the ALJ determined that Mr. Joyner had an RFC of light work with additional limitations. 2008 WL 595943, at *13. While SSR 83-10 indicates that the "full range of light work requires standing or walking, off and on, for a total of approximately 6 hours in an 8-hour workday," such requirements are only applicable to someone capable of performing the full range of light work without additional limitations.

Florida the sedentary, unskilled you have approximately 2,514 jobs. And in the United States you have approximately 142,684 jobs. *And I would state under that hypothetical such an individual would be able to work as a companion. The <u>DOT</u> is 309.677-010. It is light with an SVP: 3. It is semi-skilled. And the reason I identified companion is that you could sit as long as you liked or you could stand.* And if you can conduct your own [activities of daily living] you can work as a companion because you might have to fix a light lunch for the person you're sitting with or if you're overnight it may be a dinner. In the United States at the light, semi-skilled you have approximately 354,539 jobs and in Florida you have approximately 9,188 jobs. And I would identify the position as an office helper. <u>DOT</u> is 239.567-010. It is light and it is unskilled with an SVP: 2. And I'm only going to identify the sedentary numbers for general office helper. In Florida at the sedentary, unskilled you have approximately 6,233 jobs. And in the United States at the sedentary, unskilled you have approximately 98,235 jobs. (Emphasis supplied).

T. 64-65 (emphasis added). In the decision, the ALJ questioned Jarrell's statement that the claimant's RFC limited him to only sedentary work. T. 22. Instead, and with attention to the regulations, the ALJ noted that because claimant has the "exertional capacity to lift and carry ten pounds frequently and twenty pounds occasionally," he is able to do certain–and inferentially, limited–types of light work despite his standing and walking limitations. T. 22. As discussed previously, the ALJ's characterization of the light work requirements is proper. *See supra* pp. 27-28.

Finally, claimant contests the ALJ's statement that Jarrell indicated claimant could perform the "light" occupation of Companion. According to claimant, Jarrell meant to characterize the Companion occupation as being "sedentary" and therefore found no "light" jobs in the national or state economy that the claimant could perform. (Doc. 18, p. 14). Review of Jarrell's testimony reveals such an assumption to be incorrect. Jarrell specifically indicated that she was only citing "sedentary" job numbers for both the General Office Helper and Small Products Assembler positions. For Companion, however, Jarrell noted she was putting forward "light" job numbers and did not say that she was deviating from the Dictionary of Occupational Titles and reclassifying the occupation or job numbers for Companion as "sedentary." T. 64-65. Moreover, after describing the occupation of Companion, Jarrell explained why the occupation would be particularly suitable for the claimant, an explanation she did not repeat with respect to either Small Products Assembler or General Office Helper. Given these facts, the undersigned cannot conclude that Jarrell mistakenly referred to the Companion job numbers as "light" instead of "sedentary." Plaintiff's counsel had the opportunity to better clarify the context of Jarrell's remarks, but declined to do so. Plain reading of Jarrell's response indicates that she put forward Companion as a "light" occupation that exists in significant numbers in both the national and state economies that the claimant–given his assessed RFC–would be capable of performing. Constrained to not act as a fact-finder in this matter, the undersigned cannot reach a conclusion contrary to Jarrell's direct testimony. Accordingly, claimant's third argument fails as well.

It is therefore respectfully RECOMMENDED:

1. The applications for disability insurance benefits and supplemental security income be DENIED and the Commissioner's decision be AFFIRMED.

2. The clerk be directed to close the file.

At Pensacola, Florida, this 23rd day of January, 2014.

/s/ *Charles J. Kahn, Jr.*

**CHARLES J. KAHN, JR.**
**UNITED STATES MAGISTRATE JUDGE**

<u>NOTICE TO THE PARTIES</u>

Any objections to these proposed findings and recommendations must be filed within fourteen days after being served a copy hereof. Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control. A copy of any objections shall be served upon any other parties. Failure to object may limit the scope of appellate review of factual findings. *See* 28 U.S.C. § 636; *United States v. Roberts*, 858 F.2d 698, 701 (11th Cir. 1988).